## HALL et al. v. TAYLOR.

No. 6191—Opinion Filed June 21, 1916.

(158 Pac. 373.)

**1. Libel and Slander—Actions—Sufficiency of Evidence.**

Plaintiff brought suit against several defendants for writing, printing, and publishing certain alleged false, malicious, defamatory, and libelous matters, and upon a trial the evidence wholly failed to connect any of the parties by any positive testimony with the commission of any of the acts charged. Held, that upon demurrer to the evidence by defendants the court should have sustained such demurrer and instructed the jury to return a verdict for defendants.

**2. Same—Instructions.**

Where plaintiff's petition contains charges that are libelous per se, and other charges that are not libelous per se, it is error for the trial court to instruct the jury that each of the charges contained in plaintiff's petition are libelous per se.

(Syllabus by Clay, C.)

Error from District Court, Blaine County; James R. Tolbert, Judge.

Action by C. M. Taylor against W. H. Hall and others. Judgment for plaintiff, and defendants bring error. Reversed and remanded for new trial.

C. F. Dyer, for plaintiffs in error.

Wm. O. Woolman, for defendant in error.

Opinion by CLAY, C. This action was commenced in the district court of Blaine county by C. M. Taylor, defendant in error here, against W. H. Hall et al., plaintiffs in error here, and for convenience the parties will be referred to as plaintiff and defendants, respectively, as they appeared in the court below.

The plaintiff brought this action against a number of defendants, charging that the defendants, "wickedly intending to injure the plaintiff, did unlawfully, willfully, and maliciously write, print, and publish and cause to be written, printed, and published of and concerning this plaintiff, and of and concerning this plaintiff in his official capacity as city marshal of the said city of Geary, containing among other things the following false, malicious, defamatory, and libelous matters, to wit:

(1) "Your marshal (meaning this plaintiff) was heard to say he knew that they were bootlegging (meaning persons in said city of Geary were bootlegging, or selling intoxicating liquors in violation of law) but that they (meaning such bootleggers and sellers of intoxicating liquor in violation of law) were blowing their heads off (meaning that such bootleggers were talking about the fact that this plaintiff did know of it). Why didn't Mr. Taylor (meaning this plaintiff) go and arrest these offenders and save the county expense. Matters look dark to us."

(2) "One of the worst bootleggers in Geary is a strong supporter of C. M. Taylor (meaning this plaintiff) and was seen electioneering for him (meaning this plaintiff) on the streets while drunk (meaning that said supporter was drunk). What do these kind of actions mean? It means that your marshal (meaning this plaintiff) has his hand ready to receive the precious coin, which means hush money." (Thereby charging and meaning to charge that this plaintiff is a corrupt official and would not do his duty in law enforcement if he was approached with money.)

(3) "Your marshal (meaning this plaintiff) has used his gun freely. This is not a wild and woolly Western community, but civilized and he (meaning plaintiff) has been paid by some of your citizens for using his gun to crack people on the head and still at the same time he is upheld by some of your citizens for his vicious and unmanly acts" (thereby charging and intending to charge this plaintiff with being unnecessarily vicious because of being paid by private citizens so to be).

(4) "Why don't your marshal (meaning this plaintiff) treat all alike? His favorite was seen to ride across the sidewalks recently and Mr. Taylor (meaning this plaintiff) looked at him, why didn't he take him to jail. No, he is one of Mr. Taylor's (meaning plaintiff) pets" (thereby charging and meaning to charge that this plaintiff had been guilty of malfeasance in office, and was not administering the duties of his office impartially).

(5) "A certain resident of your town was known to go to Mr. Taylor (meaning this plaintiff) with a plea of hard times and asked permission to run a poker game, to which your marshal (plaintiff meaning) re-

plied favorably (thereby charging and meaning to charge that the plaintiff had agreed to violate his oath of office, and knowingly permit violations of law by permitting gambling) but in case a complaint was made he (plaintiff) would give him (meaning the persons who was running the poker game) time to get out of the way." (Thereby meaning to charge and did charge this plaintiff with agreeing to violate his oath of office and permit gambling, and to give such notice to the gambler as should be necessary for him to make his getaway and thus avoid and evade the penalties of the law."

(6) "Your marshal (plaintiff meaning) has been arrested in Geary not long ago for shooting craps and fighting in a dive. Look at the police docket" (thereby meaning to charge and did charge this plaintiff with having been arrested before the police court of Geary for shooting craps, in others words charging plaintiff with having committed the crime of gambling and that the police docket of Geary showed this fact).

(7) "We are reliably informed that C. M. Taylor (plaintiff meaning) received his mail in the name of Charley Tanner on account of depredations committed in Texas. Do we want a criminal for city marshal? Have we not got a law abiding good man to fill the position?" (thereby charging and meaning to charge that this plaintiff had been guilty of the violation of the criminal laws of the state of Texas and was attempting to conceal his identity to avoid detection).

At the close of plaintiff's evidence a demurrer was sustained as to all of the defendants except H. R. Paden, Joseph Paden, Wilbur Paden, and C. A. Leach, and upon trial the jury found against these defendants. Judgment was entered against them, and they appeal.

Defendants present a great number of assignments of error, but inasmuch as this cause will have to be reversed, we will note only such of them as we think necessary.

The first assignment, that the court erred in overruling their motions for a new trial, is covered by subsequent specific assignments.

The second assignment, that the demurrer to the petition should have been sustained, we think is not well taken in this court, for the reason that it was not presented to the trial court in the motions for new trial.

The third assignment, that the court erred in overruling the objection to the introduction of evidence, we think is not well taken for the reason that the petition, as a whole, state a cause of action. Revised Statutes 1910., sec. 4959.

The petition might have been subject to a motion to make more definite and certain, or to strike, on the ground, that articles libelous per se and others not libelous per se

were joined in the same petition without an allegation of special damages, but this point was not raised.

The sixth, seventh, and ninth specifications, that the court erred in not sustaining a demurrer to the plaintiff's evidence, overruling their motion for an instructed verdict, and refusal to give a peremptory instruction, will be treated together.

We have carefully examined the evidence in this cause, and we fail to find in the record any evidence that the defendants, H. R. Paden, Wilbur Paden, Joseph Paden, and C. A. Leach, either wrote, published, or circulated the libelous matter charged in the petition, or any other matter of which complaint is made in the petition, or that they caused it to be done. The only testimony in the record tending to show that any of these parties participated in the publication or circulation of the alleged libelous matter is the following:

Witness Tafford Williams:

"Q. Do you remember seeing Mr. H. R. Paden on the 4th day of May, 1911, or in Geary just before the election? A. In April I should say. Q. In April just before election was held? A. Yes, sir. Q. Now, at that time —I will hand you Exhibit A and ask you if you saw any of these papers like that on that morning? A. Yes. sir. Q. Now, where did you see them? A. In Henry Dettweiler Meat Market. Q. Did you have any of them? A. Yes, sir. Q. Who gave them to you? A. Henry Paden or Henry Dettweiler. I don't know which. Q. What did he tell you to do with them? A. Distribute them. Q. Where did he tell you to distribute them? A. All over town. Q. Did you do it? A. Yes, sir. * * * Q. Who paid you for distributing them? A. Henry Dettweiler."

Witness Earl Slumbo:

"Q. Here I will hand you Exhibit A and ask you if you ever saw any papers like that before? A. Yes, sir; I did. Q. When did you see them? A. On election day. Q. In the morning? A. Yes, sir. * * * Q. What did you do with them? A. I distributed them. Q. Who gave them to you to distribute? A. I think it was Henry Paden. I would not say for certain. Q. Who else was there at that time? A. Henry Dettweiler. Henry Paden. Joe Paden. I do not believe Wes Morrison was there. Q. Was Leach there? A. Yes, sir. * * * Q. And were they present when Mr. Paden gave you these papers? A. I do not know exactly whether Charley Leach was there or not. I think he was in front of the shop. * * * Q. Who paid you? A. Al Becker. Q. Who told him to pay you? A. I don't know. Q. Who owns the butcher shop? A. Wilbur Paden and Davis. * * * Q. About how many of these circulars did you circulate for them? A. Fifty or 75. Q. Did you go down to the depot that morning? A. Yes, sir; I went towards it: did not go

clear to it. Q. Who did you see? A. Henry Paden and two or three others. Q. Where did he first speak to you about distributing these papers? A. He was not the one. Q. Who was? A. Henry Dettweiler. * * * "

On cross-examination:

"Q. You say Henry Dettweiler is the man who spoke to you about circulating these papers? A. Yes, sir. Q. And Al Becker paid you? A. Yes, sir. Q. At the time Henry Dettweiler spoke to you about distributing them, you waited until he gave them to you? A. No, sir. Q. Who gave them to you? A. I would not say exactly. I think Henry Paden. Q. Are you certain? A. No, I would not be certain * * * Q. You say Al Becker paid you? A. Yes, sir. Q. That was all there was connected with it? A. Yes, sir. * * * Q. You saw Mr. Leach and had a conversation with him that morning? A. No, I overheard him say he would take some over to the pool hall and leave them there. Q. He was speaking about these papers? A. Yes, sir. * * * Q. Did he have any papers in his hand? A. Four or five. Q. He said he would leave them there? A. At the pool hall. Q. Are you certain he was talking about these papers? A. No. Q. He did not hire you? A. No, sir. Q. Nor Mr. Leach did not pay you anything? A. No, sir. Q. You would not swear whether he circulated any or not? A. No: I would not swear it. * * * Q. Who done the talking? A. Henry Dettweiler came over to my place in the morning and asked me if I wanted to distribute some papers, and I told him. Yes. Q. He is the one who employed you? A. Yes, sir."

On redirect examination:

"Q. Did Henry Paden hand them to you? A. I think he did. Q. That is your recollection? A. Yes, sir. * * * Q. Did Henry Paden tell you not to destroy any of them? A. They said not destroy any of them."

On recross-examination:

"Q. You say you are not positive that Henry Paden gave you these? A. Yes, sir. Q. I want to know whether he gave you these papers? A. Not for exact. I wouldn't swear he did. It has been so long ago."

. There is no evidence whatever in the record connecting the defendants Wilbur Paden, Joseph Paden, and C. A. Leach with the publication or circulation of the alleged libelous matter, and the only evidence tending to connect H. R. Paden therewith is the testimony above quoted. The Dettweiler and Becker mentioned by the witnesses were not parties to this suit. Neither does the petition charge the defendants with acting together or conspiring together to do the things complained of. Under the pleadings we do not think the evidence above quoted is sufficient to warrant the jury in returning a verdict against the defendant H. R. Paden. While our Supreme Court has repeatedly held that,

where there is any conflict of evidence, the finding of the jury will not be disturbed, yet it has also held that where there is no evidence to sustain the verdict it is the duty of the appellate court to reverse and remand the cause. Denver. W. & M. R. Co. v. Adkinson, 28 Okla. 1, 119 Pac. 247; Howard v. Farrar, 28 Okla. 490, 114 Pac. 695; Conwill v. Eldridge, 35 Okla. 537, 130 Pac. 912; Spaulding Mfg. Co. v. Holiday, 32 Okla. 823, 124 Pac. 35. We think the trial court erred in not sustaining defendants' demurrer to the plaintiff's evidence.

The eighth assignment of error complains of the instructions of the court. One of these, No. 7, reads as follows:

"(7) The court instructs you that each of the publications or charges complained of by the plaintiff and set out in his petition are, what is known and called in law 'libelous per se.' That is, they are each charges and publications, when proven that they have been made by the defendants, or either of them, of and concerning the plaintiff, the law presumes to be false and malicious, and to entitle the plaintiff to recover substantial damages. However, this presumption may be overcome by evidence."

In our opinion the giving of this instruction was reversible error. It is not every written charge against an individual that will sustain a suit for damages. Where the article itself is not libelous per se, there must be an allegation and proof of special damages before a recovery can be had. We think neither paragraphs 1 nor 4 is libelous per se, and plaintiff has not attempted to support this action by allegations or proof of special damages, but relies solely upon his allegation of general damages. Fanning v. Chace. 17 R. I. 388, 22 Atl. 275, 13 L. R. A. 134, 33 Am. St. Rep. 878; McKee v. Ingalls, 5 Ill. 30. The giving of this instruction permitted the jury to consider these two paragraphs in connection with the others complained of as a basis for finding general damages. Where the article complained of is not libelous per se, plaintiff must allege in his petition facts showing wherein he sustained special damages, and proof of the special damages must be introduced. McKinney v. Carpenter, 42 Okla. 443, 141 Pac. 779.

There are a number of other specifications of error argued by defendants; but inasmuch as the case must be reversed and remanded for a new trial, and as these errors will not likely occur in the next trial, we will not discuss them further.

For the reasons above stated, we recommend that this cause be reversed and remanded for a new trial.

By the Court: It is so ordered.